**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**v.**<br><br>**CHRISTOPHER AUBIN, ANCHOR STATE CAPITAL LLC, f/k/a ANCHOR STATE INVESTMENTS LLC, and ANCHOR STATE PROPERTIES LLC,**<br>**Defendants,**<br><br>**and**<br><br>**ASHLEY CORCORAN,**<br>**Relief Defendant.** | **Civil Action No. 25-CV-** |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Christopher Aubin ("Aubin"), Anchor State Capital LLC, formerly known as Anchor State Investments LLC, and Anchor State Properties LLC (collectively with Aubin, "Defendants") and Relief Defendant Ashley Corcoran ("Corcoran"):

## SUMMARY

1. This case involves the misappropriation and misuse of investor assets by Aubin and his companies, Anchor State Capital LLC and Anchor State Properties LLC. Together, Anchor State Capital LLC, formerly known as Anchor State Investments LLC, and Anchor State Properties LLC will be referred to as "Anchor State." Defendants engaged in a fraudulent scheme and made and used false and misleading statements in connection with the sale of Anchor State securities. In total, the Commission estimates that Defendants raised over $2.5 million from at least 24 investors between at least April 2023 and at least December 2024 (the "Relevant Period").

2. As part of their scheme to defraud, Defendants issued Anchor State securities to investors in the form of "Investment Contracts," "Real Estate Partner Contracts," or "Partner Contracts." These contracts, typically signed by Anchor State and by each investor, promised investors that: (1) Anchor State would use money invested with Anchor State to make short-term, high-interest rate loans to borrowers as an alternative to traditional financing; (2) some of Anchor State's loans were "hard money" loans, meaning that they were secured by the value of the underlying property for which the loan was being provided and Anchor State would repay the loans if the borrower defaulted; (3) the loan proceeds would be used solely to finance specific loans made to Anchor State borrowers; and (4) investors would be repaid their principal and their investment profit when the investment contracts matured, from the principal and interest payments made by the loan borrowers.

3. In truth, Defendants made very few real loans to borrowers and instead used investors' funds largely to make payments to earlier investors and to pay for Defendants' own business expenses and the personal expenses of Aubin and Relief Defendant Corcoran. Those personal expenses included lavish meals, luxury travel and vehicles. Defendants' scheme thus has many hallmarks of a Ponzi scheme.

4. In the course of soliciting investments, and lulling investors who were inquiring about why they had not been repaid when their investments matured, Defendants made numerous false and/or misleading statements to investors. Defendants misrepresented: the uses to which investors' money had been put, the existence and status of the loans for which the investments were purportedly made, the purported reasons why Defendants could not repay the loans when they were due, and the nature and success of Defendants' business.

5. Defendants were able to keep the scheme going longer than it may otherwise have

lasted because they were able to convince some investors to roll over the principal and promised interest from maturing investment contracts into new investment contracts with a higher balance. Defendants were thus able to avoid the need to make payments on some investment contracts when they were originally due.

6. In mid-2024, however, Defendants were sued in state court by two investors whose investment contracts had matured but had not been repaid in full. Other investors who were in a similar position joined in that lawsuit in December 2024.

7. As of the date of this Complaint, Defendants have failed to repay at least $2 million in investment principal to investors with matured investment contracts. This sum does not account for the investment returns that Defendants promised to these investors.

8. As a result of the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5] and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)]. Further, Relief Defendant Corcoran received proceeds of Defendants' fraud, which in equity she is not entitled to retain.

9. Based on these violations, the Commission seeks from Defendants: (1) permanent injunctions enjoining them from engaging in the transactions, acts, practices, and courses of business of the type alleged in this Complaint in violation of the federal securities laws; (2) disgorgement of ill-gotten gains from the unlawful conduct set forth in this Complaint pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(5), (7)], together with prejudgment interest; (3) civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and such other

relief as the Court may deem appropriate.

10. The Commission also seeks, against Relief Defendant Corcoran, disgorgement of her ill-gotten gains together with prejudgment interest thereon, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act [15 U.S.C. §77t(d)(1), 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C §§78u(d), 78u(e) and 78aa].

12. Venue is proper in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C §78aa]. Defendant Aubin resided in the District of Massachusetts during the Relevant Period. Also, certain of the acts, practices, transactions and courses of business constituting the violations alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly, or indirectly, by making use of the means or instrumentalities of transportations or communication in interstate commerce, or the mails, including the internet and the telephone. Some of Anchor State's investors reside in the District of Massachusetts.

13. Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS AND RELIEF DEFENDANT

14. On information and belief, Christopher Aubin, age 30, currently resides in Walpole, Massachusetts, and he resided in Walpole during a portion of the Relevant Period. During a portion of the Relevant Period, Aubin may have resided in Lincoln, Rhode Island.

Aubin is the owner and CEO of both Anchor State entities.  Aubin served in the U.S. Marine Corps.

15.     Anchor State Capital LLC, formerly known as Anchor State Investments LLC, is a Rhode Island corporation with a principal place of business in Providence, Rhode Island.  It was incorporated on May 11, 2023, and changed its name to Anchor State Capital LLC on September 30, 2024.  Of the presently-known investors in this scheme, all but two investors were issued investment contracts in the name of Anchor State Investments LLC.  At all relevant times, Aubin has exercised control over Anchor State Capital LLC and has run all aspects of its business.

16.     Anchor State Properties LLC is a Rhode Island corporation with a principal place of business in Providence, Rhode Island.  It was incorporated on October 7, 2024.  Of the presently-known investors, two were issued investment contracts in the name of Anchor State Properties LLC and another made his investment payment to Anchor State Properties LLC.  At all relevant times, Aubin has exercised control over Anchor State Properties LLC and has run all aspects of its business.

17.     Ashley Corcoran, age 27, resides, on information and belief, in Attleboro, Massachusetts and may have lived, at times, with Aubin in Walpole, Massachusetts.  During at least part of the Relevant Period, Corcoran was romantically involved with Aubin.

## FACTUAL ALLEGATIONS

**Aubin's and Anchor State's Purported Business**

18.     On its website, at least on or about June 22, 2024, Anchor State advertised itself as providing "Access To Capital When You Need It," and further said that it both provided lending services to borrowers and provided "Tailored Financial Planning from Accredited

Professionals" under a heading of "Planning Futures and Investing." One of the "Frequently Asked Questions" was "How Can I Determine Which Investment Opportunity is Right for Me?"

19. By September 21, 2024, the "About Us" tab of Anchor State's website represented that Anchor State is "Your Trusted Partner in Financial Success," and listed attributes of "Investing with Anchor State," including stability, cash flow, amortization, tax benefits, leverage and appreciation, which were all focused on investments in real estate. Under another "Private Lending" tab, the website described its private lending business as involving "hard money lending" that could be available for borrowers "whether you're looking to fund a new investment venture, undertake a home renovation project, cover unexpected expenses, or consolidate debt." Anchor State also stated that another aspect of its business was buying houses from individuals, "No Matter The Condition."

20. Aubin described his Anchor State business to numerous investors as a short-term, "hard money" lending company that made loans to borrowers for property-related financing projects, real estate investments or other business-related purposes. A "hard money" loan is a secured loan based on a property's value rather than loans based on the borrower's credit worthiness. Aubin also told several investors that Anchor State made money on the points and other fees that borrowers paid to get a loan from Anchor State, and that investors would make money by selecting one or more of the loans to finance, and their investment return would be the interest that the borrower paid to Anchor State.

21. Aubin told investors that they could choose which particular projects or loans they would like to finance with their investment principal. The investors' role was passive; they expected to profit from Defendants' efforts. Aubin, and others working with him, typically gave investors and potential investors lists of loans that were available for financing. Those lists

contained information concerning the particular projects to which Anchor State could lend the investor's funds, including terms such as the length of the loan, the interest rate, the points the loan would carry, and the purpose of the loan. An excerpt of one of these available loan lists appears below:

oans for investment as of January 2nd, 2024

| Amount | Months | Interest Rate | Points added | Availability Y/N | Purpose for request |
|---|---|---|---|---|---|
| $14,500.00 | 3 | 17.00% | 2 | y | landscape in N attleboro |
| $17,600.00 | 4 | 15.00% | 2 | y | new plumbing and electical fix/flip |
| $19,000.00 | 3 | 16.00% | 2 | y | windows and door for remodel |
| $22,750.00 | 3 | 18.00% | 2 | y | driveway in smithfeild |
| $26,500.00 | 3 | 18.00% | 2 | y | septic system putnam |
| $27,250.00 | 3 | 17.50% | 2 | y | land clearing cumberland |
| $31,000.00 | 3 | 18.00% | 2 | y | lot clearing in foster |
| $33,000.00 | 4 | 17.00% | 2 | y | commerical hvac, previous additon |
| $33,000.00 | 3 | 15.00% | 2 | y | siding for newport ri |
| $38,000.00 | 4 | 16.00% | 2 | y | utlities in west warwick |
| $38,000.00 | 3 | 18.00% | 2 | y | Addition in warwick RI |
| $40,000.00 | 6 | 16.00% | 2 | y | hvac for bowling alley renovation |
| $42,500.00 | 6 | 15.00% | 2 | y | electrical in providence |
| $45,000.00 | 4 | 17.00% | 2 | y | Wood Flooring in Newport |
| $47,500.00 | 4 | 18.00% | 2 | y | Deck/patio addition to existing loan |

22. To memorialize investors' investments, Anchor State provided investors with a contract. These contracts, which for different investors were titled "Investment Contracts," "Partner Contracts," and/or "Real Estate Partner Contracts," had generally similar terms and were typically signed both by Anchor State and by the investor.

23. Anchor State's investment contracts stated that investors would receive returns of between 12% and 19% for investments lasting between one month and eight months.

24. The investment contracts typically stated that Anchor State was "engaged in the business of LENDING (e.g. expansion, construction flips, hard money, real-estate purchases, etc.)," stated that Anchor State "desires to use the Investor's funds to fund this event in

consideration for the items listed in this Agreement," and provided that "[n]o other expenses may be paid for with the Funds the Investor provides the Company."

25. The investment contracts each matured on a specified date (usually between one and eight months in the future) and typically provided that investors would be repaid their principal plus their investment return when the investment matured. Several investment contracts provided that investors would be paid monthly interest, with the principal to be repaid when the investment matured.

26. The investment contracts offered by Defendants between July 2023 and early June 2024 also promised that, if the loan to finance the selected project defaulted, Anchor State would back the investor with its own equity, assets, and funds. The investment contracts offered in June 2024 and July 2024 provided that, in the event of a default, Anchor State would "work in a timely manner to return principal to investor." After July 2024, the provisions about what would happen in the event of a default were removed (except as to one investor who had made multiple investments dating back to November 2023).

27. Investors typically transferred their investment funds to Anchor State by check, wire transfer, or, in a few instances, by giving cash to Aubin.

28. Aubin's sales pitch to potential investors included his trustworthiness as a Marine Corp veteran. At least two of Defendants' investors were Marine Corps veterans who had served with Aubin.

29. Relief Defendant Corcoran performed some work for Anchor State. She responded to inquiries by some investors when their investment funds were not repaid when those funds were due.

30. To date, the Commission has identified at least 24 investors who invested with Anchor State during the Relevant Period. Those 24 investors invested over $2.5 million with Anchor State.

**Examples of Specific Investments**

31. Investor 1 entered into a "Real Estate Partner Contract" with Anchor State on August 26, 2024, pursuant to which he invested $50,000. The contract promised Investor 1 a return of 12% for an investment that would mature in approximately one month, on September 30, 2024. Thus, Investor 1 expected to be repaid $56,000. In verbal discussions, Aubin told Investor 1 that his money would be used for a hard money loan that would serve as the down payment for land and that Anchor State was in "first position" with respect to the land.

32. When Investor 1's investment matured, Aubin told Investor 1 that the land deal had closed and he had the money to repay Investor 1. Aubin sent Investor 1 a purported screenshot from his bank system that showed a wire transfer of $56,000 was processing. This screenshot appears to have been fabricated. The wire transfer did not arrive in Investor 1's bank account and Aubin told Investor 1 that he had changed banks and there was a problem because his account had been flagged. Aubin then promised to send Investor 1 a check. The check never arrived.

33. At the time of Investor 1's investment, Anchor State maintained bank accounts at TD Bank, N.A. ("TD Bank"). Aubin was the sole authorized signatory on Anchor State's bank accounts.

34. Anchor State's bank records show that Investor 1's funds were not used to make investments, contrary to the representations in the Real Estate Partner Contract. Rather, a

portion of Investor 1's funds were used to fund payments to another investor and certain unknown individuals; another portion was transferred to Aubin's personal account.

35. Investor 2 entered into an "Investment Contract" with Anchor State on January 4, 2024, pursuant to which he wired $145,500 to Anchor State's bank account. This investment was supposed to mature three months later, on April 4, 2024. Before Investor 2 entered into this Investment Contract, Anchor State sent Investor 2 a list of "Loans for investment as of January 2nd, 2024," which contained information concerning the particular projects to which Anchor State could lend Investor 2's funds, including terms, such as the length of the loan, the interest rate, the points it would carry, and the purpose of the loan. Investor 2 chose to invest in projects that were described as "driveway in Smithfield," "septic system putnam," "lot clearing in foster," "land clearing cumberland," and "[a]ddition in warwick RI," and Anchor State provided him with an account statement listing the loans he had chosen to finance and stating that Anchor State owed him a total of $171,553.75 in principal and profit on his investment. This list of loans provided by Anchor State indicated that each of these loans carried an interest rate of between 17.5% and 18%.

36. When Investor 2's Investment Contract matured, he requested payment from Aubin. Aubin promised to pay him promptly, but then provided a series of excuses for why he could not repay Investor 2.

37. At the time of Investor 2's investment, Anchor State maintained bank accounts at TD Bank. Aubin was the sole authorized signatory on Anchor State's bank accounts.

38. Anchor State's bank records show that it made two payments to Investor 2 totaling $29,345: one wire payment of $26,845 on April 23, 2024 and one check for $2,500 dated May 1, 2024. In addition, Aubin left a check for Investor 2 and other investors at a business

owned by another investor. When Investor 2 attempted to deposit that check in the amount of $144,708.75 from Anchor State, which was dated May 9, 2024, the check bounced. At the time Aubin provided this check to Investor 2, he knew or was reckless in not knowing it would bounce because Anchor State's accounts were not even close to containing sufficient funds to pay it.

39. Since that time, Investor 2 has received no other payments from Aubin or Anchor State. Investor 2 continues to contact Aubin to seek payment and Aubin gives him a variety of excuses about why Aubin and Anchor State cannot pay, including that he had repaid some other investors, that he had gotten in over his head with a social media influencer circle and could not handle his business, that he had problems caused by a lawsuit filed by several investors and that an attorney had taken his money.

40. Anchor State bank records show that Investor 2's funds were not used to make the five loans contemplated by his investment contract. Rather, those bank records show that Investor 2's funds were combined with funds from another investor, and were used to fund a large ($294,629) transfer to a title and closing company, as well as transfers to another investor and other individuals, two cash withdrawals, and two transfers of funds to Aubin's personal account.

41. Investor 3 entered into a "Partner Contract" with Anchor State on June 24, 2024, pursuant to which she invested $85,000. The contract promised Investor 3 a return of 19% for an investment that would mature in approximately three months, on September 20, 2024. Thus, Investor 1 expected to be repaid $101,150. Before her investment, Anchor State sent Investor 3 a list of projects in which she could invest. Investor 3 understood, based on her discussions with Aubin and the language in her Partner Contract, that her investment would be used only to

finance the two projects that she had selected from Anchor State's list of loans that were available for investment.

42. To pay for her investment, Investor 3 wrote a check for $85,000 on her company's account at BayCoast Bank. Aubin personally collected the check from Investor 3 on June 24, 2024. Investor 3 made the check out to Aubin personally but wrote "Anchor State AM01-02" in the check's memo line, which was a reference to the numbers of the two projects in which she chose to invest.

43. Later in the day on June 24, 2024, Aubin took Investor 3's check to BayCoast Bank and cashed the check. Aubin received a $75,000 bank check and $10,000 in cash. He then immediately used $55,000 of the $75,000 check to open a personal account in his own name at BayCoast Bank and took out another $20,000 in cash. Later that day, Aubin went to a different BayCoast Bank branch and withdrew $7,000 in cash and paid his attorney $8,000 from his new personal account, leaving a $40,000 balance. The next morning, June 25, 2024, Aubin paid another investor $24,570 from his BayCoast personal account by check. Later that day, Aubin went to a third BayCoast Bank branch and withdrew the remaining $15,430 in the form of a bank check for $10,000 (plus a $5 fee) and $5,425 in cash and closed his personal account at BayCoast Bank. Thus, Aubin did not use Investor 3's investment funds to finance two projects as Defendants had promised. Rather, Aubin used her funds to repay another investor and for his own personal and/or business expenses.

44. When Investor 3's loan was about to mature, Aubin asked Investor 3 if she would like to roll over her investment into another project. Investor 3 decided to withdraw her investment in cash. Aubin gave Investor 3 various excuses about why she was not being repaid. Aubin sent Investor 3 a Fund Withdrawal Form so that Anchor State could repay her investment

by wire transfer. Investor 3 completed and returned that form to Defendants but was not repaid.

45. Throughout the fall of 2024, Investor 3 spoke to Aubin about weekly. On multiple occasions, Aubin told Investor 3 that she would be repaid within a few days but the repayments were never forthcoming and he would give her excuses as to why the payments were not made. Those excuses related to aspects of Aubin's personal life and his tax obligations.

46. To date, Defendants have not repaid any of Investor 3's principal or promised investment income.

**Aubin and Anchor State Misrepresented the Uses of Investors' Funds and their Conduct is Characteristic of a Ponzi Scheme**

47. Defendants' representations that investors' funds would be used only to provide loans to Anchor State borrowers and would not be used for other purposes were, in many instances, false and misleading. At the time they made these representations, Aubin and Anchor State knew, or had reason to know, or were reckless in not knowing, that the money invested by their investors was not, and would not be, used to fund the loans that were described in the investors' investment contracts. Anchor State's bank records show few, if any, disbursements of funds in dates or amounts that match the loans that were described in the investors' investment contracts. Further, Anchor State's bank records do not show repayments from borrowers to Anchor State.

48. Instead, Anchor State's bank records show a pattern of investors' funds being disbursed shortly after they were deposited to fund, among other things: 1) payments to other investors whose investment contracts had matured, 2) payments to personal bank accounts belonging to Aubin, 3) cash withdrawals, and 4) payments to various entities for Aubin's and/or Corcoran's living expenses and luxury travel.

49. The use of later investors' funds to repay earlier investors whose investments had matured is characteristic of a Ponzi scheme.

50. In addition, Aubin solicited certain investors to "roll over" their principal and investment return into a subsequent investment, *i.e.* decline to take the payout and instead directly reinvest the proceeds in the scheme. Such an approach is characteristic of a Ponzi scheme because it allows the operator of the Ponzi scheme to avoid needing to make a payout, thereby keeping investor funds under his or her control.

51. Many Anchor State investors whose investment contracts have matured have not been repaid either their principal or promised investment return. Based on the information available to the Commission, Aubin and Anchor State took in at least $2 million more in investor deposits than they have repaid to investors.

**Relief Defendant Corcoran Benefitted Financially From Defendants' Fraud**

52. Aubin and Anchor State transferred proceeds from their fraudulent investment scheme to Relief Defendant Corcoran for no legitimate purpose or consideration.

53. On information and belief, on or about February 7, 2024, Aubin spent about $66,805 from Anchor State's bank accounts to purchase a BMW automobile. Aubin then gave that automobile to Corcoran for her personal use. Corcoran thus received a personal benefit to which she was not entitled.

54. On numerous occasions in 2023 and 2024, funds from Anchor State's bank accounts were used to pay for luxury travel, including private jet transport, for Aubin and Corcoran. Corcoran thus received a personal benefit from these gifts of travel to which she was not entitled.

55. On April 23, 2024, Aubin transferred $20,000 from one of Anchor State's bank

accounts to his personal bank account and then, the same day, withdrew $15,000 from that personal account in the form of a bank check made payable to Corcoran's mother with a notation on the check that it was "Re: Ashley E. Corcoran." On information and belief, Corcoran thus received a personal benefit from this indirect withdrawal from Anchor State's bank account to which she was not entitled.

56. Between about October 28 and December 10, 2024, a total of $22,400 was transferred from Anchor State Properties' bank account to a personal account jointly owned by Aubin and Corcoran at Bank of America. On information and belief, Corcoran received a personal benefit from the expenditure of the funds in the bank account she jointly owned with Aubin.

## FIRST CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES

**Defendants' Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

57. Paragraphs 1 through 56 above are re-alleged and incorporated by reference as if fully set forth herein.

58. By reason of the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly, (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

59. Defendants' conduct involved fraud, deceit, manipulation or deliberate or reckless disregard of regulatory requirements and directly or indirectly resulted in substantial losses to other persons.

60. By reason of the conduct described above, Defendants violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R §240.10b-5] thereunder.

**SECOND CLAIM FOR RELIEF**
**FRAUD IN THE OFFER OR SALE OF SECURITIES**

**Defendants' Violations of Sections 17(a) of the Securities Act**

61. Paragraphs 1 through 56 above are re-alleged and incorporated by reference as if fully set forth herein.

62. By reason of the conduct described above, Defendants, directly or indirectly, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

63. By reason of the conduct described above, Defendants violated Securities Act Sections 17(a) [15 U.S.C. §77q(a)] and will continue to violate that section unless enjoined.

**THIRD CLAIM FOR RELIEF**
**OTHER EQUITABLE RELIEF, INCLUDING**
**UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**

**As to Relief Defendant Corcoran**

64. Paragraphs 1 through 56 above are re-alleged and incorporated by reference as if fully set forth herein.

65. Section 21(d)(5) of the Exchange Act states, "In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

66. Relief Defendant Corcoran received ill-gotten funds by means of Defendants' fraudulent conduct in selling securities to investors. Relief Defendant has no legitimate claim to this property. In equity and good conscience, Relief Defendant should not be allowed to retain such funds.

67. As a result, Relief Defendant is liable for unjust enrichment and should be required to return her ill-gotten gains, in an amount to be determined by the Court. The Court should also impose a constructive trust on the ill-gotten gains in the possession of Relief Defendant.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A. Permanently restrain Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R §240.10b-5] by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material

fact, or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective investor, about: (A) any investment strategy or investment in securities, (B) the prospects for success of any product or company, (C) the use of investor funds, (D) compensation to any person, (E) Defendant's qualifications to advise investors; or (F) the misappropriation of investor funds or investment proceeds.

   B. Permanently restrain Defendants, their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §§77q(a)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in the offer or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of a material fact, or any omission of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person, or (ii) disseminating false or misleading documents, materials, or information or making, either orally or in writing, any false or misleading statement in any communication with any investor or prospective

investor, about: (A) any investment strategy or investment in securities, (B) the prospects for success of any product or company, (C) the use of investor funds, (D) compensation to any person, (E) Defendant's qualifications to advise investors; or (F) the misappropriation of investor funds or investment proceeds.

C. Order Defendants and Relief Defendant to disgorge, with prejudgment interest, their ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, pursuant to Section 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §78u(d)(5), (7)];

D. Order Defendants each to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F. Grant such other further relief as the Court may deem just and proper.

**JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.

DATED: May 15, 2025

Respectfully submitted,

/s/ Kathleen Burdette Shields
Kathleen Burdette Shields (BBO# 637438)
Heidi Mitza (BBO# 647909)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
Phone: (617) 573-8904 (Shields direct)
(617) 573-8929 (Mitza direct)
(617) 573-4590 (fax)
ShieldsKa@sec.gov (Shields email)
MitzaH@sec.gov (Mitza email)